**Affirm and Opinion Filed March 4, 2013**



In The

## Court of Appeals
## Fifth District of Texas at Dallas

———————————————————
No. 05-11-00503-CR
———————————————————

### CLARENCE L. BAILEY, Appellant

### V.

### THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 6
Dallas County, Texas
Trial Court Cause No. F09-23666-X

# OPINION

Before Justices Lang-Miers, Myers, and Richter[1]
Opinion By Justice Lang-Miers

Appellant Clarence L. Bailey appeals his conviction for capital murder. In five issues, he

challenges the sufficiency of the evidence to support the conviction, the trial court's rulings on

his motion to dismiss the indictment, and the admission of certain evidence. For the following

reasons, we affirm the trial court's judgment.

## I. FACTUAL BACKGROUND

On June 16, 1992, in Garland, Texas, 79-year-old Elma Adkins was in her son's kitchen

helping him pack to move to a new house a short distance away. At the house with her were her

———————————

[1]The Honorable Martin E. Richter, Retired Justice. Court of Appeals, Fifth District of Texas at Dallas, sitting by assignment.

son's 12-year-old daughter, Melania, 10-year-old son, Adam, and 9-year-old son, Mark. Melania was in the living area and the two boys were playing in the bedroom. Adkins's son, Ronnie Tyler,[2] his wife, and their two oldest children had taken a load of belongings to the new house. Around 8 pm, Melania heard a knock on the door and thought it was her dad coming back from the new house. Then she heard a kick, "the door flung open," and two guys with guns came in the house. The men were wearing black clothing and ski masks. Melania testified that her grandmother came out of the kitchen, saw the men, cursed, put her hands up in front of her face, and turned. One of the gunmen shot Adkins on the left side of her face. She fell on the kitchen floor, where she died. The other gunman shot Melania in the shoulder; the bullet exited her body and shattered the glass fireplace screen. Melania pretended to be dead, but watched the men through mostly shut eyes. She saw them go toward the bedroom. She also saw a shadow on the wall outside and thought there was a third person with the gunmen.

Mark and Adam hid in the closet when they heard the gunshots. They opened the closet door slightly and saw the two gunmen standing in the bedroom. The gunmen shot at the boys several times and then left. Melania said that as the gunmen left they "were whooping and hollering like they just did something right. And they ran out the front door." They removed their masks as they left, but she did not see their faces.

Melania went to check on her brothers. Mark had been shot in the leg and Adam had been shot in the side and chest. She moved them to the bathroom, told Mark to help Adam put pressure on the wounds to stop the bleeding, and locked them in the bathroom. Then she called 911 from the kitchen and described what happened to the operator. The operator stayed on the

---

[2]The record showed that Ronnie Tyler's real name was Ronnie Adkins. Tyler testified that he and his family were in the witness protection program, and Tyler was the name he was going by at the time of the murder. For clarity, we will use "Tyler" in place of the references to "Adkins."

line with Melania until emergency personnel arrived. The children survived but were unable to identify the gunmen.

Officer Brian McDuffie was dispatched to the scene. He saw a black nylon cloth or stocking in the grass. He said it did not appear to be a ski mask. Neighbors told McDuffie that they heard tires squealing, and McDuffie found tire marks in the street near the house. One of the neighbors saw a blue car leaving the area. The neighbors also told McDuffie that the week before this incident one or more black males were in the neighborhood asking them about the residents of the house.

McDuffie canvassed the area hotels and motels for dark-skinned males with a vehicle matching the descriptions the neighbors gave. He found a match: Dedrick Jones, from Hernando, Mississippi, a town near Memphis, Tennessee. The registration showed an arrival and departure date the week before the murder.

The police determined that the motive for the murder was a dispute over money Jones had given to Tyler, a bail bondsman, for Jones's girlfriend's bail. The police learned that in the weeks before the murder, Jones's girlfriend, Santina Jeffries, was arrested at a bus station in Houston, Texas, with five kilos of cocaine that she was carrying for a drug dealer in Memphis named Edward Williams. Her bail was set at $200,000. Tyler agreed to post the bond for a total of $22,000, which included Tyler's fee of $2,000. Jones and two other men drove to Tyler's house in Garland to give Tyler the money for the bond. The testimony conflicted about whether Jones ever gave Tyler all the money or only a portion. Shortly before the murder Jones called Tyler and asked for his bond money back. Tyler agreed to refund all but $500, but Jones wanted all of the money back. Jones threatened Tyler, but Tyler thought he was just "throwing his chest out . . . ." Jones said, "Man, I'm coming down there to get my money; don't make me come down there and . . . do something that I don't want to do." Jones also left voicemail messages on

3

Tyler's answering machine stating, "I am coming to get my money, don't make me come down there and do something that I don't want to do." Tyler last spoke to Jones a day or two before the murder. It was a short conversation, and Jones said he was coming to get his money and did not "want to have no problem out of you. . . . And remember, don't make me do anything that I don't want to do . . . ."

Having determined a motive for the murder, the police identified three suspects during the course of their investigation: Jones; appellant's brother, Ronnie Ollie, who was said to be Jones's right-hand man; and Jeffries' brother Anthony Troy Rogers. The State brought charges against Jones and Ollie in 1993, but they had "rock-solid" alibis. A female friend said Jones was with her in Memphis when the shootings occurred, and Ollie was involved in a traffic accident in Memphis about the same time as the shootings in Garland. The grand jury declined to indict them. The police were unable to locate Anthony Rogers, and the case went cold.

In 1995, Williams, the drug dealer in Memphis, was serving time in a federal penitentiary and contacted the Garland police with information about the Adkins murder. He told the police that he, Jones, and Ollie, grew up together in Mississippi and that Jones and Ollie, among others, worked for him in his drug business. Williams said he and Jones were at the bus station when Jeffries was arrested. He said Jones contacted a bail bondsman in Memphis about posting Jeffries's bond and the Memphis bail bondsman in turn called Tyler. Williams said he gave Jones a kilo of cocaine "to turn into cash" for Jeffries's bond, but Jones lost the money gambling. Williams then gave Jones $20,000 in cash. He said Jones and Ollie went to Texas a couple of times, but each time they came back without Jeffries. Then one morning Jones came to Williams's house; Jones had a handgun, either a 357 or .45, a mask, and gloves. Jones said he was going back to Texas to find Tyler and he "was going to get [Jeffries] out of jail or find Mr. [Tyler] and kill his family." Jones said Jeffries's brother was waiting in the car and that they

4

were going to pick up "Main" on their way to Texas. Williams said that when Jones got back from Texas he told Williams that he went to Garland, kicked in the door of Tyler's house, and "shot this old lady in the head" "in the kitchen." Jones told Williams that Rogers and Main "shot the kids and throwed them in the closet." Williams told the police that Ollie's brother was also called "Main." This led the police to investigate appellant as a suspect in 1995. The police showed Williams a photograph of appellant and Williams said he was about 90% sure it was Main.

The detective re-interviewed Jones's female friend in Memphis who had provided Jones's alibi, and she recanted her alibi. Jones was indicted for the murder in 1996, but was not tried for the murder in Garland until 2007 because he was serving time in Mississippi on an unrelated crime and "just got lost in the shuffle."

Meanwhile, in 1996, detectives talked to Ollie. He gave a statement admitting that he went to Texas with Jones to give the bail bondsman the money to get Jeffries out of jail. When she did not get out of jail, Jones said he was going to Texas to "see what was up and to get his money back and go see" his girlfriend. Ollie said he heard Jones later bragging that he killed the people in Texas. Ollie did not say anything in 1996 about appellant's involvement in the murder.

In 2007, before Jones's trial, Garland cold-case detective Gary Sweet got involved in the investigation. He went to Memphis to re-interview witnesses, including Ollie. This time Ollie told the detective that he had heard that Jones, appellant, and Jeffries's brother "went to Garland and went into a house and did a shooting." Ollie also said appellant told him seven or eight years prior to this "that he was with [Jones] in Garland when they shot them people."

5

Sweet also learned that Jeffries had two brothers and that the police had been looking for the wrong one. Sweet located the other brother, Michael Rogers,[3] who told Sweet that he, Jones, and Main drove to Texas in Ollie's car. Rogers said he did not know Main before this time and never saw him again after that night. He identified appellant at trial as Main.

Rogers said when they arrived at Tyler's house, Jones and Main put on ski masks. Jones kicked the front door in and forced his way in the house; Main went in behind Jones. Rogers said he went up to the porch of the house, but that he did not go inside. He heard shooting and screaming; he thought he heard about five or six gunshots. He said Jones and Main were not in the house "even a minute" when they ran back to the car, still wearing their masks, and they drove back to Memphis. On the way back, Jones and Main tossed a blue bag out of the car. Rogers assumed the guns and masks were in the bag.

The State charged appellant with the capital murder in April 2009. Later that year police talked to a witness named Larry Porter.[4] Porter saw appellant on a crime show about an unrelated crime and called the Memphis Police Department stating he had information about a murder in Texas. The Memphis police called the Garland police, and Sweet contacted Porter. Sweet and another detective went to Memphis to talk to Porter. Their conversation was recorded.

Porter told the detectives that he was dating Charlotte, appellant and Ronnie Ollie's sister, in 1992 when the murder occurred in Garland. He said appellant was known back then as "Main" and "Little Dusty." Porter said Jones was very upset about a bail bondsman in Texas who had run off with $20,000 of Jones's money. He heard Jones tell Ollie, "this motherf— done ran off with twenty thousand dollars of my money." And Jones was very upset that his girlfriend had not gotten out of jail. Jones told Ollie he wanted to go back and "deal with the bail

---

[3] Michael Rogers spelled his name "Rodgers" on a Miranda sheet. The reporter's record and the parties, however, spell his name "Rogers." We will use the spelling used in the record and by the parties.
[4] Porter identified himself to the police using his brother's name. The State learned his real name shortly before appellant's trial.

6

bondsman" and he wanted Ollie to go with him. Porter said Ollie "didn't have a heart to go down there and kill nobody" and Jones asked Ollie if Ollie knew anyone who would go with him. According to Porter, that is when appellant "came in play."

Porter heard Jones offer appellant $5,000 to go with him to Texas. Porter saw Jones give half the money to appellant upfront and tell appellant he would get the other half when they got back from Texas. Porter saw appellant and Jones leaving for Texas the next morning around 5 am in Ollie's blue Cutlass; they were wearing all black clothing and had on skull caps.

Porter testified that the next morning when Jones and appellant arrived back at the Ollie house, appellant "came in the house, he had like he had adrenaline pumping. He said, [']We killed every motherf— thing in the house.[']" Appellant pulled a .45 handgun from his waist, laid it on the table, and said "[we] kicked the door in. The first person [we] hit was the old lady, the old lady got hit in the hallway, held her hands up like this here (indicating)." Appellant bragged about shooting the "old lady" in the face. Then appellant said that they "pursued to start doing kids. . . . Start executing the kids, try to execute the kids." He thought appellant said that after they shot the lady, "the kids ran to the back" bedroom. Appellant told Porter that one of the children got in the closet and one got in the bed. As appellant described what happened, Porter thought appellant was "[b]ragging on about what they did. . . . It seemed like it just was a trophy to him. Seemed like he just did it, you know, saying like he got a high off doing it, you know." Porter said Jones and appellant bragged about using a revolver also, but Porter did not see the revolver. Porter also said appellant's mother made appellant get rid of the gun because she did not want it in her house. Appellant later told his mother that he threw the gun in the river.

Sweet testified that during his investigation he learned that the physical evidence was destroyed in 1993 as a result of a clerical error after the grand jury declined to indict Ollie and Jones. But he said the evidence was analyzed before it was destroyed and the reports created at

7

the time showed the evidence recovered in 1992 "wasn't even evidence. There was nothing there." There were no hair fibers on the stocking found outside and no fingerprints on the cartridge cases.

The deputy chief medical examiner testified that Adkins died from a gunshot wound to the head. She stated that a large caliber bullet entered Adkins's left eyebrow region, caused the left eye to collapse, went through the left side of her brain, and lodged in the cranial bulb of the skull. The medical examiner described the entrance wound as having an irregular shape instead of the typical round shape, and said it was possible that the bullet hit something else before it hit the victim's face.

The firearms expert testified that the bullets found at the scene were from two guns: a .45 caliber semiautomatic firearm and a .38 caliber/357 Magnum. He testified that the bullet size for a .38 Special is the same as for a 357 Magnum, and he had no way of determining which fired the bullets. The cartridge cases found at the scene were all .45 caliber and shot from the same semiautomatic firearm. The police did not recover any cartridge cases from the .38/357 firearm, indicating that it was a revolver because a revolver does not expel the cartridge cases. The police never found the firearms used in the crime.

The trace evidence expert testified that she found gunshot residue on the back of Adkins's left hand and a soot-like material on her right hand. She said those findings were consistent with Adkins having either fired a gun, being in close proximity to a gun when it was fired, or having handled a gun.

The State also introduced tape recordings of appellant's personal telephone calls from jail. In one of those calls appellant told Ollie that "they fixin' to extradite me." Ollie asked appellant what he told "them folks[.]" Appellant said, "I didn't tell them nothing. I told them I don't know nothing about what went on down there." Ollie said, "That's all you got to do. You

8

tell them I went but I stayed outside. That was that on that. I don't know what was going on. I ain't know [sic] what was going on inside, point blank. Yep. That's all you gotta know. . . ."

After the State rested its case in chief, appellant called his sister Charlotte as a witness. She testified that she dated Porter from 1992 to 1995. She said Porter used crack cocaine in June 1992. She disagreed with Porter's testimony about appellant coming into his mother's house after the murder, putting a gun on the table, and talking about shooting people in Texas. She said it never happened. And she said Porter was not a credible witness.

## II. SUFFICIENCY OF THE EVIDENCE

The State indicted appellant for capital murder. A person commits capital murder if the person intentionally causes the death of an individual in the course of committing or attempting to commit burglary. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1) (West 2011); .03(a)(2) (West Supp. 2012). In his first issue, appellant argues that the evidence is insufficient to support the conviction because there was no direct evidence of his involvement and the accomplice witness evidence was not corroborated.

### A. Standard of Review

When an appellant challenges the sufficiency of the evidence to support a conviction, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Id.* If the evidence is conflicting, we "'presume that the factfinder resolved the conflicts in favor of the prosecution' and defer to that determination." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)). This standard is the same for both direct and circumstantial evidence. *Id.*

9

Texas law also requires the State to corroborate accomplice witness testimony with other, non-accomplice evidence tending to connect the defendant to the offense. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005); *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). The corroboration is not sufficient if it merely shows an offense was committed; the evidence must tend to connect the defendant to the commission of the offense. TEX. CODE CRIM. PROC. ANN. art. 38.14; *Smith*, 332 S.W.3d at 439. In reviewing a challenge to the sufficiency of non-accomplice evidence, we must determine whether the direct and circumstantial non-accomplice evidence shows that rational jurors could have found the non-accomplice evidence sufficiently tended to connect the accused to the offense. *Smith*, 332 S.W.3d at 442. To do this, we "consider the combined force of all of the non-accomplice evidence that tends to connect the accused to the offense." *Id*. And when there is a conflict in the views of the evidence, we defer to the jury's resolution of the evidence. *Id*. The non-accomplice evidence need not be sufficient to establish guilt. *Id*. at 442–43.

## B. Discussion

Appellant argues that the State's case "was entirely circumstantial." He argues that the surviving witnesses could not identify him, the "significant physical evidence" was destroyed in 1993, there was no DNA evidence, no fingerprints, no gun, no motive, and the only evidence connecting him to the crime came from a convicted drug dealer, uncorroborated accomplice testimony, and a witness "whose knowledge was not only problematic but inconsistent with the accomplice testimony."

It is undisputed that Ollie and Rogers are accomplices. Consequently, we must disregard their testimony and any prior statements they made to third persons in determining whether the non-accomplice testimony tends to connect appellant to the offense. *See McDuff v. State*, 939 S.W.2d 607, 612 (Tex. Crim. App. 1997).

10

Appellant concedes that Porter was not an accomplice. But he argues that Porter's testimony was not credible, was contradicted by Charlotte, and was inconsistent with Rogers's testimony.

Porter testified that he saw Jones give appellant $2500 upfront to go to Texas with him, and he saw appellant and Jones leave for Texas in Ollie's blue car the next day. They were dressed in black clothing. Melania testified that the gunmen wore black clothes, and a neighbor told police he saw a blue car leaving the area about the time of the murder. Porter also saw appellant and Jones when they returned the next day. Appellant described the crime, and many of the details matched the crime scene. Appellant said they shot "the old lady" first, they shot her in the face in the kitchen, and she threw her hands up before they shot her. Melania testified that the gunmen shot Adkins first. Adkins was found in the kitchen with a gunshot wound to the face. She had gunshot residue and soot on her hands. The medical examiner testified that the entrance wound was irregular and could be explained by the bullet hitting something else before it hit Adkins's face. Appellant said they shot the children in the bedroom. Two of the children were shot in the bedroom closet. Porter also testified that appellant bragged about using a .45 and a revolver in the crime. The firearms expert testified that the bullets recovered at the scene were shot from a .45 and a .38/357 Magnum, probably a revolver.

Williams also was a non-accomplice witness. He testified that Jones came by his house on the way to Texas and said he was going to either get Jeffries out of jail or kill Tyler and his family. Jones told Williams that Main and Rogers were going with him. Williams testified that sometime after Jones returned from Texas, Jones described how they forced their way into the house, shot "this old lady in the head," and "shot the kids and threw them in the closet." As with Porter's testimony, Williams's testimony about Jones's description of the murder matched

11

several of the details from the crime scene. Williams identified a picture of appellant from a photo lineup and said he was about 90% positive it was Main.

The jury weighed the credibility of the non-accomplice testimony and, to the extent it conflicted with other evidence, resolved the conflicts against appellant. We conclude that the non-accomplice evidence was sufficient to tend to connect appellant to the offense and that we may consider the accomplice testimony of Ollie and Rogers in our evaluation of the sufficiency of the evidence to support the conviction. *See McDuff*, 939 S.W.2d at 613.

In the light most favorable to the verdict, the evidence showed that appellant, Jones, and Rogers went to Texas to get Jones's bond money back or to kill Tyler and his family. The evidence showed that Jones and appellant forced their way into Tyler's house, shot and killed Tyler's mother, and shot three of Tyler's children. We conclude that the evidence is sufficient to prove the elements of the offense beyond a reasonable doubt. We resolve issue one against appellant.

### III. MOTION TO DISMISS INDICTMENT

In issues two, three, and four, appellant argues that the trial court abused its discretion by denying his motion to dismiss the indictment. The motion alleged three grounds for dismissal: the State's alleged failure to preserve the identity and contact information of a Mississippi police officer's confidential informant named Lucy, the State's destruction of physical evidence, and the State's 19-year delay in charging appellant with the murder. The trial court held multiple hearings on appellant's motion and denied it.

### A. Standard of Review

We review a trial court's ruling on a motion to dismiss the indictment under a bifurcated standard. *State v. Krizan-Wilson*, 354 S.W.3d 808, 816 (Tex. Crim. App. 2011). We give almost total deference to a trial court's implied findings of fact that are supported by the record and to

12

mixed questions of law and fact that rely upon the credibility of a witness. *Id.* We apply a de novo standard to pure questions of law and mixed questions that do not turn on credibility. *Id.* Because the trial court denied appellant's motion, we presume the trial court resolved any disputed fact issues in the State's favor. *Cantu v. State*, 253 S.W.3d 273, 282 (Tex. Crim. App. 2008).

## B. Ground 1: Failure to Preserve Lucy's Identity

In 1992, a Garland detective met with Lucy, a confidential informant of a Mississippi police officer, to talk to her about her knowledge of the Garland murder. The detective's handwritten notes showed that Lucy told the detective she overheard Ollie and Jones at a party talking about the murder; Ollie asked Jones for his $500 for "cap[ping] that old lady"; and Ollie is Jones's "hit man." The notes also state, "C.I. advised if she is named that she was told by [Jones] that she is a dead bitch."

The Mississippi police officer who introduced the confidential informant to the Garland detective typed his notes from the meeting. Although his notes do not refer to "Lucy," no one contends that the notes refer to any other confidential informant. His notes state that the informant picked out a picture of a black male who was involved with Jones, but the informant did not remember the male's name; the informant met with the Garland detective a second time and said the "black male 'Ronnie Ollie' did go with" Jones to Texas and "Ronnie Ollie did pull the trigger"; and the informant told the Garland detective "that another black male, last name Williams, went with them." The notes also state that the informant met with two Mississippi police officers five days after the meeting with the Garland detective and told the Mississippi police that five people went to Texas. Williams was one of the five; appellant was not.

The State agreed Lucy's statements were exculpatory and disclosed the statements to appellant along with a copy of the officers' notes. The State advised appellant that it had been

13

unable to locate Lucy. Appellant filed the motion to dismiss and argued that without Lucy's testimony, he had "no way of getting that exculpatory information in front of this jury."

On appeal, appellant argues that if Lucy had testified at trial consistently with what she told the detectives in 1992, it "would squarely put Ollie not only in Garland but in the role of the second shooter." He argues that Lucy's testimony "would refute Ollie's testimony, Rogers's testimony, and Porter's testimony . . . [and] would also have refuted Williams, given him motive to lie, and placed him in the role of an accomplice." Appellant contends that the "utter failure of the Garland police *to obtain* and preserve evidence from Lucy must be charged against the prosecution as a *Brady* violation since it deprived Appellant of exculpatory evidence." [First emphasis added.]

## 1. Applicable Law

A *Brady* violation occurs when the State suppresses evidence favorable to the defendant. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). "'*Brady* and its progeny do not require prosecuting authorities to disclose exculpatory information to defendants that the State does not have in its possession and that is not known to exist.'" *Harm v. State*, 183 S.W.3d 403, 406–07 (Tex. Crim. App. 2006) (quoting *Hafdahl v. State*, 805 S.W.2d 396, 399 n.3 (Tex. Crim. App. 1990), *overruled on other grounds by Cook v. State*, 858 S.W.2d 467 (Tex. Crim. App. 1993)). The State's duty under *Brady* attaches when the information comes into the State's possession. *Id.* "However, the [S]tate is not required to seek out exculpatory evidence independently on appellant's behalf[.]" *Id.*

## 2. Discussion

The State informed the trial court that Lucy talked to the Garland detective on the condition of anonymity, and appellant does not dispute that representation. Appellant states in his brief on appeal that "[t]he identity of Lucy, as well as another confidential informant, was not

14

given to the Garland detectives." *Brady* prohibits the State from suppressing exculpatory evidence in its possession, but it does not require the State to seek out, in other words, "to obtain," exculpatory evidence on the defendant's behalf. *See Brady*, 373 U.S. at 87; *Harm*, 183 S.W.3d at 406–07. Additionally, appellant's inability to locate Lucy did not prevent him from presenting the exculpatory evidence to the jury. The trial court allowed appellant to offer Lucy's statements through the testimony of Detective Sweet. Defense counsel cross-examined Sweet about Lucy's statements to the detectives in 1992:

> Q. And [Lucy] said — at the time said that she overheard Ronnie Ollie apparently asking Dedrick Jones, Where is my $500 for killing that old lady, or some words to that effect?
>
> A. Yes.
>
> Q. And at the time Lucy did not want to give her name. Is that your recollection of how that went?
>
> A. Yes.
>
> Q. And so today we don't have any idea who Lucy was?
>
> A. No.

And because Lucy did not testify, the State was unable to impeach Lucy's statements about Ollie's request for "$500 for killing that old lady."

We conclude that because the State disclosed Lucy's statements to appellant before trial, *Brady* does not apply. *See Brady*, 373 U.S. at 87; *Harm*, 183 S.W.3d at 406–07.

Appellant also argues, however, that when the Mississippi police officer "facilitat[ed] the meeting with Lucy, [the officer] became a part of the police investigation and hence a part of the prosecution team," and the officer should have preserved evidence of Lucy's identity. Appellant does not cite authority or evidence in the record to support his argument that the Mississippi police officer became a part of the "State" by facilitating a meeting between his confidential informant and the Garland detective. *See Pena v. State*, 353 S.W.3d 797, 810 (Tex. Crim. App.

15

2011) (stating "'the State' includes . . . members of law enforcement connected to the investigation and prosecution of the case."); *see also Davidson v. State*, 249 S.W.3d 709, 722–23 (Tex. App.—Austin 2008, pet. ref'd) (stating that relationship among various jurisdictions must be examined to determine whether agency relationship existed).

Assuming that the Mississippi police officer could be construed as part of the "State," appellant was required to show that the officer destroyed Lucy's identification information in bad faith. *See Illinois v. Fisher*, 540 U.S. 544, 547–48 (2004) (per curiam) (requiring defendant to show evidence destroyed in bad faith) (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) and *California v. Trombetta*, 467 U.S. 479, 488–89 (1984)). Despite appellant's argument that he is not required to show bad faith under the Texas constitution, this Court has concluded that the state constitution and the federal constitution provide the same due process protections. *See State v. Rudd*, 871 S.W.2d 530, 532–33 (Tex. App.—Dallas 1994, no pet.). As a result, appellant must show that the police officer destroyed the information about Lucy's identity in bad faith under both constitutional claims. *See id.*

The record shows that appellant was not a suspect in 1992 when the Garland detective met with Lucy. Appellant was first mentioned as a possible suspect in 1995, and the record is silent about when the Mississippi police officer lost or destroyed the information about Lucy's identity. The record shows that both the prosecutor and defense counsel spoke to the Mississippi officer before trial. He told both that he was no longer in law enforcement, he did not remember Lucy, and he had no files to help determine her identity. Defense counsel expressed disbelief that a police officer could forget the identity of a confidential informant. However, many years passed between the date of the meeting with Lucy and the date the former officer was contacted about Lucy's identity. Defense counsel attempted to subpoena the former officer, but told the trial court that local Mississippi counsel would not return telephone calls.

16

Giving almost total deference to the trial court's implied factual findings that turn on credibility, we conclude that appellant did not present any evidence that the officer's failure to preserve Lucy's identification information was in bad faith. *See Fisher*, 540 U.S. at 547–48; *Youngblood*, 488 U.S. at 58; *Trombetta*, 467 U.S. at 488–49; *see also Krizan-Wilson*, 354 S.W.3d at 816.

We conclude that the trial court did not err by denying the motion to dismiss on this ground. We resolve issue two against appellant.

## C. Ground 2: Destruction of Physical Evidence

It is undisputed that the Garland police destroyed all the physical evidence in 1993 after the grand jury declined to indict Jones and Ollie. The State told the trial court that the evidence had been destroyed due to a mistake by a rookie officer and that the officer was disciplined for the error. Appellant argues that the destruction of the evidence was "more than a mere case of negligence" and that the evidence was "potentially useful" because it could have been tested for "handler DNA." The State argues that even if DNA evidence had been found, preserved, and later determined not to belong to appellant, it would not exclude appellant as a suspect because three people were involved in the crime.

### 1. Applicable Law

The government's constitutional duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." *Trombetta*, 467 U.S. at 488. A defendant must show that the evidence "possess[ed] an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489. When the evidence is such that "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," a due process violation is not shown

17

"unless a criminal defendant can show bad faith on the part of the police." *Fisher*, 540 U.S. at 547–48. "'Bad faith' is more than simply being aware that one's action or inaction could result in the loss of something that is recognized to be evidence. . . . [B]ad faith entails some sort of improper motive, such as personal animus against the defendant or a desire to prevent the defendant from obtaining evidence that might be useful." *Ex parte Napper*, 322 S.W.3d 202, 238 (Tex. Crim. App. 2010).

## 2. Discussion

The evidence in this case was tested before it was destroyed. There were no fingerprints on the bullets or cartridge cases, the police never recovered a weapon to compare to the bullets and cartridge cases, and there was no hair on the stocking or cap. The destroyed evidence did not exonerate or inculpate appellant. In fact, it did not point to or eliminate any suspect. Appellant's argument that the evidence could have been tested for "handler DNA" is the argument presented in *Fisher*. The evidence is such that "no more can be said than that it could have been subjected to tests, the results of which might have exonerated [appellant]." *See Fisher*, 540 U.S. at 547–48. Consequently, appellant was required to show that the evidence was destroyed in bad faith. *See id.* But nothing in the record disputes the State's claim that the evidence was destroyed by mistake. Additionally, the record shows that appellant was not a suspect until 1995. Consequently, when the evidence was destroyed in 1993, it did not have an apparent exculpatory value as to appellant. *See Napper*, 322 S.W.3d at 238–39.

We conclude that the trial court did not err by denying appellant's motion to dismiss on this ground. We resolve issue three against appellant.

## D. Ground 3: Pre-indictment Delay

The record shows that the investigation of Adkins's murder went cold because the people who initially were the two main suspects had alibis and the grand jury declined to indict them.

18

The State indicted appellant in 2009. Appellant argues that the State's 19-year delay in bringing the charges against him violated his rights to due process and a fair trial. He argues that during those 19 years the State destroyed the physical evidence and forgot the identity of exculpatory witnesses. And he argues that the State gave "no real reason" for the delay.

### 1. Applicable Law

The primary assurance against bringing an unduly stale criminal charge is the applicable statute of limitations. *Ibarra v. State*, 11 S.W.3d 189, 193 (Tex. Crim. App. 1999). In Texas, the statute of limitations on murder is unlimited. TEX. CODE CRIM. PROC. ANN. art. 12.01(1)(A) (West Supp. 2012). However, a pre-indictment delay may violate a defendant's due process rights if the delay caused substantial prejudice to his right to a fair trial and was an intentional device used to gain a tactical advantage over the accused. *Ibarra*, 11 S.W.3d at 193 (citations omitted). The burden is on the defendant to show both prongs were met. *See id.*

### 2. Discussion

Three years after Adkins was murdered, the police learned that appellant was possibly involved. They learned this information from a convicted drug dealer who was seeking favorable treatment in an unrelated case. But the investigation stalled. The record shows that after Detective Sweet re-opened the investigation in 2007, witnesses were more forthcoming about the murder than they had been at first. The police also learned that they had been looking for the wrong Rogers. Sweet located the right Rogers in February 2009. Rogers told Sweet that he, Jones, and appellant went to Texas and Jones and appellant forced their way into Tyler's house. The State indicted appellant two months later.

Appellant admits that there is no evidence to satisfy the second of the two prongs he must prove to prevail on his claim, that is, that the 19-year delay "was an intentional device used to gain a tactical advantage over" him. But he argues that there is "no compelling reason as to why

19

the police abandoned the investigation in this case." He argues that "the record reflects nothing but inertia and dilatoriness." Appellant does not cite any authority that a showing of "inertia" and "dilatoriness" is sufficient to meet the second prong of the test. *See id.* The Due Process Clause does not require the State to seek an indictment even though the investigation is not completed or when it is not satisfied that it should prosecute or "be able promptly to establish guilt beyond a reasonable doubt." *See id.* at 194–95 (quoting *United States v. Lovasco*, 431 U.S. 783, 795 (1977)). The record does not support the conclusion that the State delayed indicting appellant for an improper purpose. *See id.* at 194.

We conclude that the trial court did not err by denying appellant's motion to dismiss on this ground. We resolve issue four against appellant.

## IV. PRIOR CONSISTENT STATEMENT

In issue five, appellant argues that the trial court abused its discretion by allowing the State to play a recording of Porter's prior oral statement to the detectives to show it was consistent with his testimony that appellant said he and Jones used a revolver in the murder.

### A. Standard of Review

We review a trial court's evidentiary rulings for an abuse of discretion. *Hammons v. State*, 239 S.W.3d 798, 806 (Tex. Crim. App. 2007). A trial court has considerable discretion to admit prior consistent statements because the determination is based in large part on "the content, tone and tenor of defense cross-examination" and the "cross-examiner's demeanor, facial expressions, pregnant pauses, and other nonverbal cues." *Id.* at 806, 808.

### B. Applicable Law

A prior consistent statement is admissible if the declarant testifies at trial and is subject to cross-examination, there is an express or implied charge of recent fabrication or improper influence, the prior statement is consistent with the declarant's challenged in-court testimony,

20

and the prior consistent statement was made prior to the time the alleged motive to falsify arose. *Id.* at 804. The requirement of an implied or express charge of fabrication or improper motive is minimal. *Id.* at 804–05.

### C. Discussion

Porter testified that appellant bragged about how he and Jones used a .45 and a revolver in the murder. Porter admitted, however, that he never saw the revolver. Defense counsel cross-examined Porter extensively about the revolver:

> Q. And you didn't see [Jones] – you didn't see the other gun; you didn't see [Jones] with a gun?
>
> A. Only thing – I didn't see [Jones] with a gun, but it was a .38 involved in that crime.
>
> Q. Because that's what you were told?
>
> A. That's what I heard. Yes, that's what I was told.
>
> Q. You never saw it.
>
> A. No, but I seen the .45 that Little Dusty had.
>
> Q. But you never saw the other gun; that's just what somebody told you.
>
> A. Ain't wasn't [sic] nobody told me; that's what I know. That was a fact it was used.
>
> Q. If you didn't see it, how do you know?
>
> A. That's what he was bragging on.
>
> Q. Okay. So that's [sic] somebody told you.
>
> A. That's what he said, came out of his mouth.
>
> Q. Who?
>
> A. Main.
>
> Q. Main told you about a revolver as well?
>
> A. He was bragging on what they did.

21

Q. But what did he say about the revolver?

A. What he say about the revolver, they had a .45 and a revolver.

Q. And that's because – I mean, how do you know they had a revolver?

A. Because he said he had a revolver.

Q. That's what Main told you.

A. That's what he was bragging on. He didn't tell me that. That what he was boasting on what they had. He didn't tell me that directly. He was telling everybody in the house what they had done.

Q. He told you that there was a .45 and a revolver?

A. Yes.

Q. And that came out of his mouth?

A. Yes.

Q. You didn't put that in your written statement, did you?

A. I don't know what I put in the written statement.

Q. Well, I am showing you what's been marked as Defendant's Exhibit Number 11. Do you recognize that?

A. Yes, I do.

Q. Is that the statement that you gave to the police in February of – or in September of 2009?

A. Yes, I did.

Q. When you told them your name was [your brother's name]?

A. Yes, I did.

Q. Did you mention a revolver, or anybody say anything about a revolver in that statement?

A. It mentioned it on the tape. It might not be in writing, but it's on the tape.

Q. What did you say about the revolver on the tape?

A. What did I say about the revolver on the tape?

Q. M-h'm.

A. Them are the type of guns that they had.

Q. How did you know that?

A. Because it was said what they had. They were boasting on what -- he was boasting on what type of guns they had.

Q. But the only gun you ever saw was the .45?

A. Only gun I saw was the .45, the one Little Dusty pulled out his waist.

Q. That was a black gun?

A. It was a black .45.

Q. You said on the tape that you never saw the other gun; is that right?

A. I said on the tape -- it's been a while ago. But I know it was two guns, it was two guns in this crime scene what they had.

On redirect, the State offered Porter's recorded conversation with the detectives as a prior consistent statement. Appellant objected that the statement was not a prior statement and that it was not "prior to any motive to fabricate or rebut — or to rebut an expressed or implied charge against the declarant of recent fabrication or improper influence." Appellant argued that Porter "was lying then and he is still lying now." In overruling appellant's objection, the trial court stated that he had observed the demeanor of the witness in the courtroom and found him to be credible. He concluded that the tape-recorded conversation was admissible under rule 801(e)(1)(B).

On appeal, appellant argues that the statement was not admissible as a prior consistent statement because it was not a prior statement and it was "nothing more than a general challenge to the witness's overall credibility" and not an express or implied charge of recent fabrication.

23

Although the State argues that appellant's trial objection was insufficient to preserve the issue for our review, we disagree.

It is difficult to determine the tone and tenor of a question from a cold record. Having reviewed the content of the questioning about the revolver, however, we cannot conclude that the trial court abused its discretion by admitting the recorded conversation.

Porter told the detectives in an interview in September 2009 that appellant said he and Jones used two guns in the crime: a .45 and a revolver. The detectives recorded the conversation, and at the end of the conversation they asked Porter to write down everything he had just told them. Porter did not write what he had said earlier about two guns being involved. Defense counsel questioned Porter over and over about how he knew a revolver was used in the crime and whether he heard it from appellant's mouth. We conclude that the questioning suggested that Porter was not being truthful in his trial testimony about the revolver, and, as a result, his prior statement was admissible to rebut the implied charge of recent fabrication. *See Hammons*, 239 S.W.3d at 804.

We conclude that the trial court did not abuse its discretion by admitting Porter's prior recorded statement to the detectives. We resolve issue five against appellant.

## V. CONCLUSION

We affirm the trial court's judgment.

ELIZABETH LANG-MIERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

110503F.U05

24



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CLARENCE L. BAILEY, Appellant

No. 05-11-00503-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 6, Dallas County, Texas
Trial Court Cause No. F09-23666-X.
Opinion delivered by Justice Lang-Miers,
Justices Myers and Richter participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 4th day of March, 2013.

ELIZABETH LANG-MIERS
JUSTICE